Daniel, J.
The liability of Southall’s estate for Sheldon and Maupin’s bond of two thousand two hundred and sixty-two dollars and eighty-two eents, is, I think, free from serious doubt. The testator by his will directed that all his property, real and personal, except his slaves, should be sold, and that the proceeds of sale, together with whatever money might be due to him, should be put and kept at interest till his children should each marry or attain the age of twenty-one years. That his wife should receive annually one-third of the profits of his estate, and that the remaining two-thirds should go to his children; and by the second and third codicils to the will the testator declares it to be his intention that each of his children shall receive his or her portion of his estate as they respectively arrive at age or marry; that the funds of his estate shall remain in the hands of his executor as trustee during the minority of the children, or till they respectively marry; that the income is to be applied to their maintenance and education; and that the executor is to have the control and management of the children.
Independent of the general obligation (arising out of the very nature of his office) requiring the executor to proceed with due diligence to the collection of the debts due to the estate, the duty of so doing (if the directions of the testator are to receive a literal interpretation) is specially imposed upon the executor, in plain and unmistakable terms.
In this aspect of the case, the duty of the executor *274 was obvious, and admitting of the exercise of little or no discretion. The bond was due, being payable on demand, and if Southall regarded it as one of the debts which he was required under the will to call in anc^ Pu^ a^ interest, it was plainly his duty, at an early period after his qualification, independent of any considerations respecting the solvency of the debtors, to have looked about and made enquiries for a proper investment of the debt; and to have demanded its payment, or at least to have notified the debtors to hold themselves in readiness to respond to his call, whenever a suitable opportunity should arise of putting the money at interest, in compliance with the terms of the will. Yet, though he took out letters of administration in March 1849, there is nothing in the record from which even an inference can be drawn, of a demand having been made of the debt, or of any communication -whatever having taken place between Southall and the debtors in relation to it, till April 1851 (a space of more than two year’s) when, after the death of Maupin, suit was instituted on the bond against Sheldon, the surviving obligor. Surely, if the terms of the will are to constitute the rule by which the conduct of the executor is to be adjudged, such a •delay, wholly unaccounted for, cannot be treated as otherwise than unreasonable and unpardonable.
The death of Southall (in November 1851) before the institution of the suit by the appellees, it is true, is a circumstance presenting an appeal in behalf of a lenient view of his conduct. The suggestion arises, that had he lived it might perhaps have been in his power to furnish some excuse for his apparent want of attention to the interests confided to his care. The force of such an appeal, however, is greatly impaired by the opposing consideration that he wholly failed to make out any inventory, or to have any appraisement of the estate, or to return any account of sales.
*275 These evidences of a neglect of duty on the part of the executor, admit, obviously, of no explanation, and their presence, in the cause, is naturally calculated to repress any feeling, on the part ©f a court of equity, to hunt after explanations, at the best conjectural, of other conduct of his, indieating a loose administration of the estate. Viewing his eonduet, however, in the most favorable light, it would be difficult to believe that with the exercise of ordinary diligence he could not have found a suitable investment for the money, in the interval between the date of his qualification as executor and that of the institution ©f the suit brought by him, or to eoneeive of any satisfactory reason why, If he contemplated a change of the debt, he did not Institute legal proceedings for its recovery at an earlier period.
It is suggested, however, that, giving to the will a more enlarged and liberal interpretation, it was not necessarily the duty of Southall to call in all the debts ■of his testator | that if the testator left any of the •debts, due to him, safely secured, the executor, though offending against the letter of the will, would be acting in aeeerdanee with its spirit, and the true intentions of the testator, in leaving such debts to remain undisturbed, seeing, that the real object of the testator was to keep his money at interest till his children should eome ©f age or marry: the interest, in the mean time to be applied t© their maintenance and ¿education.
I think w<3 should allow to Southall the benefit of this suggestion to the extent of holding that if he found any portion of his testator’s money out at interest upon such loans or investments as he, in the exercise of a sound discretion, might have properly made himself, out of the testator’s funds which might have come into his hands as exeeutor, he would have been justified in suffering such loans or investments t© *276 stand, observing, however, the same watchfulness and vigilance in looking after their continued safety, that would have been needful in respect to investments of his own making. It would savor of too close a sticking to the mere letter of the will, and of harshness to the executor, to visit him with the consequences of a devastavit for failing to essay the needless, if not hazardous process of changing one safe investment for another productive of no greater income to the estate.
We are thus led to enquire whether the bond in question is such an investment of the testator’s funds as a court of equity could properly sustain the executor in making. And were- we to follow the rule of the English chancery upon the subject, we should be compelled to answer the enquiry at once in the negative, without any regard to the solvency of the obligors to the bond at the time of the qualification of the executor. Eor though, in one of the earlier cases. Harden v. Parsons, 1 Eden R. 145, the lending of trust money on private bonds or notes, was held not to amount to .a breach of trust, without other circumstances of negligence, it is now firmly established in England, that all investments of trust money by executors and other trustees, in mere personal securities, are at their own risk. In all cases of the kind, unless express power to put out the money on personal security is. given by the cestuis que trusty or conferred by the instrument under which they are acting, trustees are held, by the courts of equity there, to account for all losses arising from loans of the trust funds, except when the loans have been secured by liens on real estate, or some other thing of permanent value. Where the executor has invested the moneys of the estate in such loans (on mortgages), or in such stocks as the court itself is. in the habit of directing funds in its own possession to be laid out in (generally the “three per cents”), and loss arises from the insolvency of the debtors and de *277 predation in the value of the mortgaged property, or from fluctuation in the stocks, the executor is excused: but in all other cases of putting out the trust funds at interest (except where authorized as before mentioned by the will or the beneficiaries), the executor is now required by the English chancery to make good all losses and deficiencies. Wilkes v. Steward, Cooper’s Ch. Cas. 6; Adye v. Feuilleteau, 1 Cox R. 24; Holmes v. Dring, 2 Cox R. 1; Powell v. Evans, 5 Ves. R. 839, and notes; Story’s Eq. Jur. § 1274, and note; 2 Lomax on Ex’ors 484.
Chancellor Kent, however, in the case of Smith v. Smith, 4 John. Ch. R. 281, whilst expressing his belief in the wisdom of the rule, as a general one, that trustees loaning money should be required to take adequate real security, or resort to the public funds, gave very strong intimations of opinion that there might be drcumstances which would exonerate trustees in taking personal security, when they had exercised proper discretion and caution in the selection of such security. And I do not think that the English rule, or one like it, can be said to have been, as yet, adopted generally in this country. Certainly no such rule has as yet been declared by this court. Indeed it seems to me that until a very recent period it would have been extremely difficult, if not wholly impracticable, to have carried out a rule of the kind, to its full extent, in this state. It is only within a few years past that we have had public stocks in such quantity as to make it generally convenient, if possible, for executors and other trustees, especially those situated in parts of the state remote from the cities, to procure them. This fact, taken in connection with the well known reluctance of our people to fetter and encumber their estates with mortgages or deeds of trust (the giving of which even for loans, at the time, are generally esteemed as impairing to a greater or less extent the *278 credit of the grantors), affords, as it seems to me, a sufficient reason why, hitherto, there should not have any intimation of a purpose on the part of our com'ts to apply a like rule here. Whether, in the &rea^7 increased facility which now exists of purchasing certificates of state stock, and in the well established policy of having, where practicable, a fixed rule on the subject, the court may not, hereafter, when passing on the recent transactions of trustees, find sufficient reasons for declaring some rule of the kind, is a matter about which I deem it unnecessary to go into any speculation or conjecture. At present I do not feel called upon to declare an executor or other trustee liable for loss, simply on the score of his having made, or allowed to stand, an investment of the trust funds in personal securities.
In the absence of any directions by the testator as to the character of the security on which his money was to be put out, I think that the executor would have been guilty of no breach of duty, in making loans to solvent borrowers, taking their own bonds or notes with one or more sureties of undoubted ability. But I do not think that he had a right (without accountability for loss) to make or continue a loan on the bond or note of the borrower alone, however ample his estate, or free from suspicion his solvency might be. Such conduct is out of the usual course pursued by prudent capitalists. To require on the one hand and to give on the other, security, in dealings of the kind, is, among men of business habits and experience, very much a matter of course.
In' the case of Miller v. Holcombe's ex'or, 9 Gratt. 665, the trustees were clothed with a very broad discretion by the deed under which they acted; yet this court held that a sale by one of them, with the consent of the other, of a portion of the trust subject, to a solvent firm, on the credit of the firm alone, consti *279 tuted, of itself, a breach of trust for which both trustees should be responsible. And the general views on the subject taken in the opinion of the court delivered by Judge Lee, would seem to me to apply with their full force to the case of a loan of his testator’s funds by an executor, or of an unreasonable indulgence extended by the latter to persons indebted to the estate for moneys borrowed of the testator in his lifetime.
As I have already intimated, we cannot look to the mass of the English decisions on the subject as a guide in this case, inasmuch as they condemn all loans by trustees on personal securities. There is, however, a class of cases arising under wills, in which the executors are clothed with the power of lending on personal securities — which, as I conceive, are directly in point. These cases expressly forbid the lending by executors on the sole credit of mercantile concerns. Of this class of cases, Langston v. Olivant, Cooper’s Ch. Cas. 33, is a marked and leading one. In that case the executors were empowered by the will to place out a specific pecuniary bequest “ upon real or personal security, as should be thought good and sufficient;” and it was declared that they should not be answerable for any loss which might happen without their willful neglect or default. The executors loaned out the amount of the legacy, together with a greater amount of their own private funds, “ to a trader” “in good credit and circumstances” at the time, who failed some years thereafter. The security taken was the bond of the borrower. It was argued that the power conferred on the executors did not extend to the lending of the money on the mere credit of a man in trade, thus making the trust property liable to all the contingencies of trade; and the executors were held to answer for the loss : the court observing that the authority of the executors did not extend to such an accommodation. And in the case of Sadler v. Hobbs, *280 2 Brown’s Ch. Cas. 114, in which the executors were held liable for failing to call in a fund with due dilithe fact that the party in whose hands the mo-11 ey was allowed to remain, was a tradesman, was one Promilien-t grounds on which the court placed its action. And it is also to be observed than Chancellor Kent, in the case of Smith v. Smith, already cited, whilst intimating the opinion that trustees should not be held liable merely for lending on personal security, very plainly disavows any disposition or purpose to extend the indulgence to cases “ where the borrower or his surety is engaged in mercantile or other hazardous fursuits.”
I am aware that there are dicta to the effect that the executor ought to be less severely dealt with in cases where he has merely continued a credit originating with the testator; it is said that blame is not to be imputed to the executor for trusting persons in whose integrity and ability the testator himself confided. Yet I recollect no case in which considerations of the kind were allowed to have any material influence on its decision. And indeed it seems to me that in passing on the conduct of a fiduciary such considerations ought to be counted as of little or no value. Otherwise we should have to abandon all idea of any thing like a general rule on the subject, and to allow every executor to have a separate standard, by which to regulate his conduct, higher or lower, dependent upon the greater or less degree of prudence which his testator may have displayed in the management of his pecuniary affairs. The allowance of any serious weight to such considerations is further opposed by the obvious argument drawn from ordinary observation and experience, that the most prudent of men are often governed in their business transactions by motives at war with their pecuniary interests. Loans may have been prompted by feelings of friendship, or debtors *281 indulged in a spirit of neighborly kindness and forbearance. How far these or motives of the like kind may have governed a testator in managing his affairs, his executor cannot well undertake to say. Any surmises, consequently, which he might form as to the degree of confidence which the testator had in the ability of his debtors, would necessarily be, generally, of the most vague and unreliable character.
s
The general rule for the guidance of executors in the administration of their trusts is thus clearly and succinctly stated by Judge Stanard, in delivering the opinion of this court in the case of Kee's ex'or v. Kee’s creditors, 2 Gratt. 116, 128. !( The duties of the executor (he says) are to be performed under the obligations of sound judgment, acting on those considerations of worldly prudence which affect the safety of the pecuniary interests confided to his care. When such judgment, so governed, is fairly exercised (and tested by the facts existing and known at the time it is exercised), is such as would probably be formed by a judicious man managing his affairs with reference to considerations of mere worldly prudence, the executor is justified in acting on such judgment; and, so.acting, is not responsible for alleged losses resulting from his conduct.” Under such a rule, I apprehend that the creditors and legatees of an ignorant, improvident or careless testator would have a right to expect just as great a degree of prudence in the administration of his estate as could be properly required of the executor of a person who had managed his affairs with the utmost wisdom and prudence. And it is difficult to conceive of any good reason for saying that an executor, who, after having had a reasonable time to survey the facts on which to form his judgment, should neglect to call in a loan of an exceptionable character or doubtful safety, should not be held to the same responsibility that would have attached to his making (under an au *282 thority to lend) a loan of the like character, under a ^e state of facts and circumstances.
The commissioner, in his report of the substance of ^ie testimony taken before him, states that, whilst it was Prove<^ Sheldon & Maupin enjoyed the general confidence of the community (Williamsburg) in which they resided, and transacted their business, and were regarded as wealthy men, several judicious persons, who thought the firm solvent, had, nevertheless, for some years before the death of Maupin, entertained the impression that the firm was not in thriving circumstances, but rather on the decline; and that Maupin was regarded by several persons as a reckless man in his business transactions. This statement is well calculated to create the belief that if Southall had used due diligence in instituting proper enquiries, he would have found that the debt was in a very precarious condition. And upon a view of the whole case, I see no reason why we should struggle to except it from the operation of those decisions which, even irrespective of special proofs touching the safety of the debt, would hold Southall responsible for having allowed the money of his testator to stand out on the obligation alone of a mercantile firm, and thus to remain exposed to the well known uncertainties and hazards of trade.
I am also of the opinion that the Circuit court has decided rightly in charging Southall with the bond of Maupin & Sheldon for one thousand and twelve dollars and ninety-five and a half cents. Much of what has been said in respect to the debt just disposed of, is applicable also to this. The former, it is true, grew out of a transaction between the testator and the firm, and the latter out of a sale by the executor to one of the members of the firm in his individual capacity. The character of the obligation taken for the debt, however, is, in each case, the same, to wit, the joint *283 and several bond of the two members of the concern. It is argued (it is true) that there is no good reason why a party should not be received as surety for another in his private dealings merely because the two happen to be associated in a mercantile firm. But of this I am not satisfied. On the contrary, the close and intimate relation which subsists between the members of such a partnership, and which confers upon each, whether prudent or reckless, an almost complete power over the pecuniary interests of all the members, presents to my mind a very strong argument why one of them, when contracting to give security, should be expected to tender some person whose credit and fortune are not thus blended with and dependent upon his own.
So far as the matter of security is concerned, the difference would seem to be one of form rather than of substance, between selling to a firm composed of two members, and taking their bond without security, and selling to one of the members, and taking his bond with the other as security.
I believe, too, that with the mercantile portion of the community, if not with business men generally, in transactions of loans of money, sales on credit, and negotiations of the like kind, when a surety or endorser is required, it is the common usage not to offer or accept one member of a mercantile firm as surety or endorser for the other.
Passing by these matters, however, without further intimation of opinion respecting them, it seems to me that Southall is clearly bound for the amount of the bond in question, on the ground that he did not use ordinary diligence in respect to it after it fell due. He sufi'ered nearly twelve months to elapse after its maturity without (so far as the record shows) making any demand for its payment. And even after the death of Maupin, the principal in the bond, he suffered three *284 months to pass before he brought Ms suit. The debt was one 011 which the debtors had no reason for ex-indulgence. When Maupin bought at the sale no doubt expected that he would be required to f,aT w^en Ms bond should fall due. And the testimony is ample to show that the debt would in all probability have been paid if payment had been demanded and insisted on.
The case of Johnston’s Estate, 9 Watts & Sergt. 107, is in point to show that after the debt became due the burden was with Southall to account for it, or to show, in case of its loss, that he had used due diligence in the effort to collect it. In England (as is said in that case) such sales are required to be for cash, and the executor is chargeable immediately after the sale with the price. But in Pennsylvania (as with us) the rule is to sell on short credits, taking bond with security. If the executor takes bond with sufficient security, he is not immediately chargeable, but on the maturity of the bond he becomes chargeable, and to discharge himself must show that the debt was lost without any default or neglect on his part. In that case the note was allowed to stand about six months, when the principal and surety, apparently before in good circumstances, both failed, and the administrator was charged with the debt.
There is nothing in the evidence more immediately applicable to the debt in question, to explain away the prima facie case made against Southall; and when we take into view his whole conduct in the management of the estate, his negligence and consequent liability are only made the more apparent.
The 6th section of the 132d chapter of the Code does not define the “ negligence or improper conduct” which subjects an executor to liability for a lost debt, and I have not regarded it, therefore, as affecting in any manner the questions which I have been consider *285 ing. The true object of the section is, as I conceive, to settle any question which might otherwise arise as to the propriety of charging the fiduciaries and other persons therein mentioned with the interest as well as the principal of debts lost by their negligence or improper conduct.
Upon the whole, I think that the decree of the Circuit court, in respect to both of the bonds of Maupin & Sheldon (viz: the bond for two thousand two hundred and sixty-two dollars and eighty-two cents, and the bond for one thousand and twelve dollars and ninety-five and one-half cents), is right. It seems to me, however, that the court erred in so much of its decree as relates to Southall’s commissions on his receipts. On the 1st of July 1850, when the Code went into operation, he had not incurred any forfeiture of commissions under the provisions of the act of 1825, only sixteen months having then elapsed since the date of his qualification as executor. The effect of the Code was to repeal the act of 1825, in such case, and there being no longer, in existence, any law declaring a forfeiture of commissions on moneys received by him prior to the 1st of July 1850, for failing subsequently to settle his accounts within two years after his qualification, he was I think entitled to such commissions. And as he died before the expiration of six months after the end of the year commencing on the 1st of July 1850 he did not incur a forfeiture of commissions, on such of his receipts as were subsequent to that date, under the 8th section of chapter 132 of the Code. Boyd’s ex'ors v. Boyd’s heirs, 3 Gratt. 113.
I perceive no other error in the principles of the decree. It seems to me, however, that before executions should be allowed to go out for the sums decreed to the infant appellees respectively, some person should be designated by the Circuit court to receive the *286 money in trust for the infants. When this shall have been done, executions can issue in the names of the with an endorsement that the money is to be P3^ to the person so designated.
^ am °P™on to reverse the decree to the extent of the error indicated in respect to Southall’s commissions, and to affirm it in all other respects: and to remand the causes to the Circuit court for further proceedings, &c.
Moncure and Lee, Js. concurred in the opinion of Daniel, J., except that Moncure, J. was not prepared to say that one partner would not be a proper surety for the other in a transaction wholy unconnected with the partnership.
Allen, P. dissented as to the bond given to the testator, but concurred in the opinion as to the one given to the executor; he being of opinion that a partner is not a sufficient surety for his copartner.
Samuels, J. dissented as to both bonds.
Reversed in fart, and affirmed in fart.